## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NADIA SABBAH, *et al.*,** | : | |
| *Plaintiffs* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SPRINGFIELD SCHOOL DISTRICT,** | : | **No. 19-5564** |
| *Defendant* | : | |

## MEMORANDUM

PRATTER, J.                                                                                      MAY 26, 2021

Schools are expected to ensure a safe learning environment for their students and staff. In light of school shootings and other acts of violence on school property, when school personnel learn of a potential threat of violence, the school is obligated to treat the threat seriously and at least investigate it. Within the bounds imposed by the Constitution and state law, schools have the reasonable discretion and authority to investigate threats and discipline their students as is appropriate. But, consistent with the obligation to act in good faith, schools often must make certain decisions with imperfect knowledge and under time pressure. With the benefit of hindsight, what initially presented as a threat may—mercifully—end up being harmless. Sometimes a school's over-cautious response may give rise to a federal cause of action. Other times—as is the case here—it does not.

For the reasons that follow, the Court grants Springfield's motion for summary judgment.

### BACKGROUND AND PROCEDURAL HISTORY

During the 2017-18 school year, Plaintiff H.M. was enrolled as a sixth grader at E.T. Richardson Middle School, within the Springfield School District. Her two younger siblings, B.M. and E.M., were enrolled in an elementary school also within the district. The family self-identifies as Arab American.

1

## I.    The "To Kill List" and the Investigation

On November 27, 2017, a sheet of paper entitled "To Kill List" was found on a classroom floor at the middle school. The anonymously authored note, which listed seven names of current students at the school, was brought to the school's administration. In response, administrators began investigating possible author(s) of the list. That evening, administrators sent a community-wide email stating that a threatening note had been found and that the families of the students listed in the note had been contacted.

To identify the author by his or her handwriting, the school collected and reviewed journals of many students in the classroom where the note was found, including H.M. Dr. Tracy Depo Tr. at 9:21-10:11. The day after the note was found, administrators questioned the students whose journals were reviewed. All of these initial interviews were conducted without parents or guardians present. Dr. Tracy Depo. Tr. at 12:20-22. H.M. initially disclaimed any knowledge of the list, as did every other student questioned. *Id.* at 14:7-10; 17:23-18:3.

While reviewing the students' journals, the principal, Dr. Daniel Tracy, noticed what he described as "concerning" writing and drawings. *Id.* at 18:22-19:6, 20:6-7. Specifically, he testified to seeing drawings of "what appeared to be knives." *Id.* at 19:2-3. Based on the content in the journal, as well as similarities in handwriting between the journal and the "To Kill List" note, Dr. Tracy determined it was worth following up with H.M. to express concern for her safety. *Id.* at 20:6-10. H.M.'s mother, Mrs. Sabbah, does not dispute that her daughter drew pictures of what look like swords or knives and wrote the words "I want to die" at the bottom of her drawing. N.S. Depo. Tr. at 18:17-19:3. But she explained that her daughter was fascinated with anime and a popular song, "I want to die" which was playing frequently on the radio at the time. *Id.*

Dr. Tracy testified that the contents of H.M.'s journal constituted "new information" or "new concerns" meriting a follow-up conversation. Dr. Tracy Depo. Tr. at 18:8-20:10. So, H.M.

2

was again asked to speak with administrators. H.M. was questioned in the presence of Dr. Tracy, Dr. Jeffrey Zweiback, the Director of Teaching and Learning for the Springfield School District, and Assistant Principal Megan Scelfo. Her parents were not present for this conversation. This time, she was asked to provide a handwriting sample writing her classmates' names. She was not shown the "To Kill List" while she wrote out her handwriting sample.

When she was asked why her handwriting appeared to be a close match to one of the names on the list, H.M. responded that she wrote "it." Dr. Zweiback Depo. Tr. at 35:6-36:3; Dr. Tracy Depo. Tr. at 28:1-2; H.M. Depo. Tr. at 33:18-23. She eventually was showed the names on the "To Kill List," but not the title of the note. She was never explicitly asked whether her "it" reference meant that she admitted to authoring the entire list or only the seventh name that seemed to be the exemplar match. However, per school officials, H.M. explained that each name on the list was someone who had allegedly wronged her. Dr. Tracy Depo. Tr. at 30:1-6. This explanation is bolstered by the "Incident Report" that H.M. wrote on November 28, in which she explained that she "made the list for people I need to stay away from" and had kept the list since she was in the second grade.

H.M. frames the events slightly differently. She testified that, although she wrote down "something for each of the names" on the list, she felt "intimidated" and "needed to write something down." H.M. Depo. Tr. at 21:21-22:1. But, she also admitted that no one coached her to write the contents of the "Incident Report." *Id.* at 40:9-12.

It is undisputed that the school notified H.M.'s parents only after she admitted to writing at least part of the note. Dr. Tracy Depo. Tr. at 32:6-8. The parties dispute what happened next. Mrs. Sabbah testified that Dr. Tracy told her that H.M. "will never be accepted in public or private school in the United States." N.S. Depo. Tr. at 8:4-5. She further testified Dr. Tracy told her that her daughter "represents a danger to my school. I have to protect my school from your daughter."

3

*Id.* at 16:19-21. Dr. Tracy denied that he spoke abruptly with Mrs. Sabbah or told her "you people have anger problems." Dr. Tracy Depo. Tr. at 58:3-9. There are no allegations that any of the school officials explicitly mentioned H.M.'s ethnicity, race, or background.

Later that evening, Mrs. Sabbah informed the school that another student wrote the list, although she would not identify that student. *Id.* at 13:22-14:6. That explanation was offered after H.M. was released to go home and had talked to her mother. H.M. Depo. Tr. at 43:2-11. That same evening, the school sent a follow-up email to the school community stating it that a student had admitted to writing the list. H.M. was not named in this communication. Doc. No. 12-17.

## II.    The Informal Hearing and Suspension

Because she admitted to writing at least part of the list, H.M. was suspended pending an informal hearing. H.M.'s parents were provided written notice of the hearing as well as the underlying allegations. The initial hearing date was pushed back four days with Plaintiffs' consent to accommodate the school's attorney's schedule. On December 5, 2017, Plaintiffs presented evidence, including a handwriting expert report and a doctor's note. Plaintiffs also again informed the school that another student was involved in the note. Doc. No. 12-18 ¶ 21. H.M. again did not deny that she wrote a name on the list but, as stated at the hearing, that was to help remind a friend of another student's name. Following the hearing, H.M. received a ten-day suspension, which was later shortened to nine days, to allow her to participate in a school concert.

At her deposition, H.M. further explained that the names were those of students with whom this alleged author did not get along. H.M. stated that she tried to get this classmate's attention by writing down a seventh name so she could be a "peace-maker." H.M. Depo. Tr. at 16:14-17:8. She testified that, at the time she wrote on the list, it was untitled (i.e., no words "to kill list" appeared at the top), *id.* at 16:14-15, and that, when she was questioned by the school officials, she

4

did not make the connection that the names of the students she was asked about were those on the list, *id.* at 28:18-23.

**III.    The "Standard Evaluation Packet"**

Roughly within a week of these events, Springfield provided H.M.'s parents with a "standard evaluation packet." Dr. Zweiback testified that, in light of the contents of H.M.'s journal—the drawings of knives and the words, "I want to die,"—he made a referral to the school's Office of Special Education. Dr. Zweiback Depo. Tr. at 72:3-6. The school represents that it supplied the standard evaluation packet as part of its "Child Find" obligations to locate students who may need special services. Among the various assessment tools in the school's standard evaluation packet, H.M.'s parents were provided with the Abbreviated Multidimensional Acculturation Scale (AMAS-ZAAB) questionnaire. The school describes this as a tool used for bicultural students to evaluate the impact of cultural identity on a child's makeup. *Id.* at 62:15-64:8. Dr. Zweiback testified that Springfield had used this battery of questions about 12 times with students referred to the Office of Special Education who the school identified as having a "bicultural family" or who were multilingual. *Id.* at 58:12-14.

Plaintiffs cast this questionnaire in a totally different light. Based on their understanding of the questions and the context in which it was provided, Plaintiffs contend that the AMAS-ZAAB is a sort of 'Patriot test' despite H.M.'s American citizenship.

**IV.    Springfield's Obligations and Contact with Police**

The Springfield School District is a public-school district organized and operating under Pennsylvania's Public School Code of 1949, 24 P.S. §§ 1-101 *et seq.* Pursuant to the Code, Springfield may enact reasonable rules and regulations regarding the "conduct and deportment of all pupils" while they are under supervision of the school. 24 P.S. § 510. Springfield has enacted various policies addressing student behavior, including discipline proceedings. Students at E.T.

5

Richardson Middle School are subject to these district-wide policies as well as the school's own code of conduct. The Code of Conduct treats threats against another person as a "Level 3 violation" that can result in a police referral. Threats made against another student or school official also violate Title 18 of the Pennsylvania Code. In keeping with its obligations under the Code, Springfield has entered into a memorandum of understanding with the local police department that governs the school's reporting obligations when it learns of certain types of threats. 24 P.S. § 13-1303-A.

The evening of November 27, the administration notified the local police department of the existence of the note. At that time, however, the school did not know which students were involved. There is no evidence that police officers immediately responded or in any way participated with the school's internal investigation and discipline. No officers were present when H.M., or any students, were questioned about the note.

Some time later, the local District Attorney's office brought juvenile criminal charges against H.M. based on her involvement with the list. The charges were later dismissed by the trial judge. There is no evidence that the school was involved in the decision to press charges, either acting with the police department or the prosecution.

At the end of the school year, H.M. withdrew from the middle school. Her younger siblings likewise withdrew from the District elementary school.

Plaintiffs—H.M., her two younger siblings, and their mother, Mrs. Sabbah—brought suit against the Springfield School District, the middle school H.M. attended, and Dr. Tracy, asserting that the defendants acted in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments and Section 1983. The parties have since stipulated to dismiss the middle school, Dr. Tracy, and the Fifth Amendment claims. Springfield, the remaining defendant, now moves for summary judgment to foreclose all claims against all Plaintiffs.

6

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. One of the principal purposes of summary judgment is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. After the moving party has met its initial burden, the non-moving party must set out "specific facts showing a genuine issue for trial." *Betts*, 621 F.3d. The non-moving party may do so by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Summary judgment is appropriate if the non-moving party fails to make a "showing sufficient to establish the existence of an element essential" to its case on which it will bear the burden at trial. *Celotex*, 477 U.S. at 322.

7

## DISCUSSION

To state a claim under § 1983, "a plaintiff must show that the defendant deprived him of a right or privilege secured by the Constitution or laws of the United States while acting under color of state law." *Williams v. Borough of West Chester*, 891 F.2d 458, 464 (3d Cir. 1989). The Court must first identify "exact contours of the underlying right said to have been violated" and then determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000).

Springfield moves for summary judgment on each of Plaintiffs' § 1983 claims arising from alleged violations of the Fourth, Eighth, and Fourteenth Amendments.

## I.      Eighth Amendment Claims

Springfield argues any claim based on an alleged Eighth Amendment violation should fail because that amendment applies to criminal and not school disciplinary matters. The Supreme Court has long emphasized that the history of the amendment and decisional law clearly establishes that it is "designed to protect those convicted of crimes." *Ingraham v. Wright*, 430 U.S. 651, 664 (1977); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (Eighth Amendment protections apply "only after the State has secured a formal adjudication of guilt in accordance with due process of law"). It does not apply in the context of school disciplinary matters—even where the school uses corporal forms of discipline. *Ingraham*, 430 U.S. at 664 (holding that the Eighth Amendment does not apply to paddling children as a means of maintaining discipline in public schools); *Wright v. Speece*, No. CIV.A.08-4784, 2009 WL 1383282, at *4 (E.D. Pa. May 14, 2009) (student proceeding against university officials was not entitled to Eighth Amendment protections); *Goodreau v. Rectors & Visitors of Univ. of Virginia*, 116 F. Supp. 2d 694, 710 (W.D. Va. 2000) (same); *Marsh v. Del. State Univ.*, No. Civ. 05–00087, 2007 WL 521812, at *2 (D. Del. Feb.15, 2007) (same).

8

As the Court previewed for the parties at oral argument, Plaintiffs cannot proceed under an Eight Amendment theory. Here, Springfield suspended H.M. for ten days. Springfield's memorandum of understanding with the local police department did not convert the school into an agent of the police, as Plaintiffs contend. H.M. was never convicted of a criminal offense, let alone incarcerated. Nor for that matter are Plaintiffs proceeding against defendant involved in the commencement of a juvenile case against H.M.

Summary judgment is thus warranted in the school's favor on the Eighth Amendment claim.

## II.     Fourth Amendment Claims

Springfield argues summary judgment is warranted as to Plaintiffs' Fourth Amendment claims. That is because it maintains that the school's questioning of H.M. was reasonable under the circumstances. Truly, the scope of Plaintiffs' Fourth Amendment claim is challenging to parse from their briefing. Plaintiffs do not appear to claim a Fourth Amendment violation based on an unlawful search, although school administration officials did review journals of the students in the class. Rather, Plaintiffs' claim arises out of H.M. being "called to the principal's office" on November 28, during which time H.M. admitted to authoring (at least part of) the list.

As a threshold matter, the Fourth Amendment applies to public schools, including school officials and employees. *New Jersey v. T.L.O.*, 469 U.S. 325, 336 (1985). Although in most contexts, probable cause is the governing standard for analyzing Fourth Amendment violations, that does not carry over for alleged violations in the public-school context. Instead, the Third Circuit Court of Appeals endorses a "reasonableness standard" to evaluate seizures in the public-school context, given the "special consideration to the goals and responsibilities of our public schools." *Shuman ex rel. Shertzer v. Penn Manor Sch. Dist.*, 422 F.3d 141, 148 (3d Cir. 2005). By adopting this standard, the appellate court gestured to the "reduced liberty interest afforded

9

students in the public-school setting." *Id.* at 149. Reasonableness is measured by balancing the student's interests against the school's legitimate interests, including its "custodial and tutelary responsibility" for its students. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995).

In an apparent effort to equate the applicable "reasonableness" standard with probable cause, Plaintiffs claim that the school acted as an agent of the police. The Court rejected that theory as part of Plaintiffs' Eighth Amendment claim, and it fares no better here. To be sure, in this case the school officials had already alerted the police to the existence of the note before they spoke with H.M. on November 28. However, it is undisputed that no police officers were present when H.M. met with the school officials. And there are no facts that the school district was involved in any subsequent investigation commenced by the police beyond making the police initially aware of a note and the fact that a student later accepted responsibility for it. School officials, of course, do not have the power to arrest and incarcerate a student. Nor is the school responsible for actions that the Springfield police department may have taken after the school reported the note to them. *See Valentino C. v. Sch. Dist. of Phila.*, No. CIV.A. 01-2097, 2003 WL 177210, at *6 (E.D. Pa. Jan. 23, 2003) (because school officials "cannot be held responsible for actions taken by the Philadelphia police once [the student] was in their custody," for Fourth Amendment purposes, the Court examined only the student's "removal from class and his detention").

At oral argument here, Springfield conceded that it was not disputing that H.M. was "seized" for purposes of the Fourth Amendment as Plaintiffs posit. So, the only question is whether the seizure was reasonable under the circumstances, accounting for the intrusion into H.M.'s privacy and the school's legitimate government interests.

Accepting Plaintiffs' version of the facts as the non-moving party on this point, H.M. had indeed drawn depictions of knives or swords and had written the words, "I want to die," in her

10

school journal. At oral argument, Plaintiffs suggest that that text is from a then-popular Japanese anime meme, which, contrary to the words H.M. wrote, is meant to address suicide prevention, not glorify it. However, there is nothing from those four words that would suggest the context that Plaintiffs ascribe to it. And the school had not heard that explanation at the time it reviewed H.M.'s journal. So, the Court concludes that the school's concern about H.M.'s drawings and the entry in her journal is reasonable.

Although students do not "shed their constitutional rights . . . at the schoolhouse gate," it is well established that public school students have a reduced expectation of privacy. *Tinker v. Des Moines Independent Community Sch. Dist.*, 393 U.S. 503, 506 (1969). It should not come as any shock that students are "subject to removal from class at any time for disciplinary reasons." *Valentino*, 2003 WL 177210, at *5. This form of "intrusion" is acceptable and expected, particularly when a school is investigating a potential threat.

As for the school's interest, the Supreme Court has emphasized that the school's "interest must be important enough to justify the particular [seizure] at hand." *Veronia*, 515 U.S. at 656. Springfield stresses that it was reacting to the discovery of a "to kill" list of current students, so the school had to investigate the note "from the lens of school safety and community safety." Dr. Zweiback Depo. Tr. at 38:14-19. In a climate of increasing threats of school violence, campus safety—"protecting students from a potentially violent situation"—is surely a compelling government interest. *Valentino*, 2003 WL 177210, at *6; *see also Boim v. Fulton Cty. Sch. Dist.*, 494 F.3d 978, 984 (11th Cir. 2007) ("We can only imagine what would have happened if the school officials, after learning of [the student's] writing, did nothing about it and the next day [the student] did in fact come to school with a gun and shoot and kill her math teacher."); *Wallace by Wallace v. Batavia Sch. Dist. 101*, 68 F.3d 1010, 1014 (7th Cir. 1995) (recognizing that "the rising tide of violence in our nation's schools warrants decisive attention"). Springfield's later admission that

the nature of the note was not the same as a student having a weapon at school, Dr. Tracy Depo. Tr. at 24:4-8, does not, however, hamstring the school from taking appropriate steps to investigate the list.

Given the potential risk to the lives of seven named current students and the school's duty to assess potential threats, the school opted to take the note seriously. (Indeed, Dr. Zweiback testified that he could "never assume that a threat isn't plausible" given how "routinely school shootings occur[] across the country." Dr. Zweiback Depo. Tr. at 56:5-8.) Here, no harm came to any of the seven students listed. But this knowledge comes with the benefit of hindsight—certainly not something the school had at the time.

Finally, the Court considers the nature of the intrusion. *Gruenke v. Seip*, 225 F.3d 290, 301 (3d Cir. 2000). In the public-school context, "reasonable" searches and seizures mean two things: it must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place." The Supreme Court explained that a search is "justified at its inception when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school." *T.L.O.*, 469 U.S. at 340-42. Although *T.L.O.* addressed a search, the same principles hold for applying the reasonableness standards to seizures in public schools. *Valentino*, 2003 WL 177210, at *5. At this point, the Court must evaluate whether the school's response was *objectively* reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 399 (1989). The Court does not delve into the school's intentions at the time. Nor is the inquiry one informed with the benefit of hindsight.

The intrusion at issue is the school's summoning of H.M. to the principal's office on November 28 and the questioning during that interview. The Court finds that the intrusion was justified at its inception. Accepting even Plaintiffs' version of the facts, H.M.'s handwriting

sample from her journal was similar to part of the note. (And, indeed, it is not in dispute that H.M. admitted to writing at least part of the note.) The similarity in handwriting, plus the drawings and text in her journal, prompted the school to follow-up with her the day after the note was found. At a minimum, the school personnel were investigating the authorship both as a disciplinary matter and safety matter. Regardless of whether H.M. authored the whole list or a portion of it, and regardless of her subjective intention in participating in the creation of the note, the school acted both in response to a perceived risk not only to the community, but also to H.M. herself.

Last, the Court finds that Springfield's conduct was reasonably related to the then extant circumstances that gave rise to the intrusion. This finding is supported by H.M.'s own testimony. H.M. testified that, after she wrote her statement explaining what happened, she was not detained in the room or otherwise kept there. H.M. Depo. Tr. at 39:24-40:2. Moreover, she admitted that none of administration officials threatened her or raised their voices at her, although she perceived them to be angry at her. *Id.* at 40:24-41:11.

Plaintiffs contend that the school's conduct was not reasonable because the school officials allegedly violated the Pennsylvania Compilation of School Discipline Laws and Regulations. 22 Pa. Code § 10.25 obligates a school to "immediately notify, as soon as practicable, the parent or guardian of a victim or suspect involved in an incident . . ." as well as whether the local police department has been or may be notified of the incident. Even assuming that a violation of the Pennsylvania Compilation of School Discipline Laws and Regulations can give rise to a constitutional violation (and the Court seriously doubts that it can), the language of the section speaks in terms of "practica[lity]." *Cf. White v. Salisbury Twp. Sch. Dist.*, 588 F. Supp. 608, 614 (E.D. Pa. 1984) (in the context of a due process claim, a school's failure to comply with state regulations governing suspensions "would violate state law *only* and would not rise to the level of a constitutional violation"). Dr. Zweiback testified that the phone call to H.M.'s mother was made

13

"within ten minutes" of his initial arrival. Dr. Zweiback Depo. Tr. at 43:2-7. Plaintiffs do not dispute this estimate or offer contradictory evidence of the length of time H.M. was "seized." And the call was placed to H.M.'s parents after it was known that she was in fact involved in creating the list. The state provision does not require more from the school. So, the Court is not persuaded that the school failed to abide by this provision. Nor was its conduct somehow wanting.

Given the brief intrusion, H.M.'s reduced expectation of privacy, the school's legitimate interest both in security as well as the wellbeing of its students, the Court finds that the school's decision to briefly question H.M. a second time about the note and about her involvement was reasonable under the circumstances. Accordingly, summary judgment is warranted as to Plaintiffs' Fourth Amendment claim.

## III.    Fourteenth Amendment Claims

Springfield also argues that summary judgment is warranted on Plaintiffs' due process and equal protection claims. As for their due process claim, Plaintiffs vaguely assert that they were denied "life, liberty and property." Plaintiffs appear to challenge the procedural components of due process insofar as Springfield conducted its investigation and meted out discipline. But, as best as the Court can tell, Plaintiffs also appear to challenge the substantive result—H.M.'s suspension. Plaintiffs argue that the suspension was not warranted in light of their argument that H.M. played, at most, a minimal role in authoring the list.

### A. Procedural Due Process

The thrust of Plaintiffs' due process argument is that the decision to suspend H.M. was pre-ordained.[1]   First, Plaintiffs allege that Springfield's decision to recall H.M. for second interview

---

[1]        Count I of the Complaint combines all causes of action brought by H.M. against Springfield. As such, the Court is left to parse what allegations specifically make up Plaintiffs' due process claim. At oral argument, the Court repeatedly requested, to no avail, that counsel identify when the cause of action accrued.

without a parent present denied her due process. Second, Plaintiffs contend that the school "disregarded [] compelling evidence" by imposing a ten-day suspension.[2] The Court finds that Plaintiffs fail to establish a prima facie case of discrimination under the Due Process Clause.

As a threshold matter, Pennsylvania law recognizes that "education is a statutory right" and H.M. has a "legitimate claim of entitlement to a public education." 22 Pa. Code § 12.8(a); *Shuman*, 422 F.3d at 149. It is undisputed that due process applies to a public-school student who is facing a possible suspension. Springfield argues that it provided sufficient due process throughout the investigation and hearing process. The Court must agree.

The Supreme Court has set forth the minimum process afforded a student facing a ten-day suspension. In such a situation, "the student [must] be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez*, 419 U.S. 565, 581 (1975). A formal hearing is not required for a possible suspension of ten days or less. *Id.* at 581. Plaintiffs do not contend that they were either not made aware of the charge against H.M.—her participation in writing the note—or that they were deprived of an opportunity to counter Springfield's presentation of the facts. To the contrary, the record shows that Plaintiffs presented expert evidence from a handwriting expert, H.M. was represented by counsel, and her parents attended the hearing. As a matter of law, the school complied with the minimal constitutional guaranteed in this scenario.

Plaintiffs' contention, thus, is not with the lack of notice or an opportunity to be heard; it is a disagreement with the result. But that dispute does not then give rise to a cognizable procedural due process violation. *See Eck v. Oley Valley Sch. Dist.*, 431 F. Supp. 3d 607, 627 (E.D. Pa. 2019)

---

[2]      The suspension was reduced to nine days, so that H.M. could return to school to participate in a school concert.

(granting summary judgment on procedural due process claim arising from suspension when school provide notice and hearing even when it admitted that student's story was "dead on arrival"); *Hemdal v. Schuylkill Valley Sch. Dist.*, No. CV 12-5925, 2014 WL 12607752, at *2 (E.D. Pa. Feb. 20, 2014) (disagreeing with the school's decision to suspend does not establish a federal due process violation).

Plaintiffs next offer some ancillary arguments for why H.M. was nevertheless denied due process. First, Plaintiffs emphasize that Springfield violated its Memorandum of Understanding and various school code violations when it contacted the local police department to alert the police to the note on November 27. Plaintiffs' argument appears to be that the school's decision to notify the police before it had both identified the author(s) of the note and scrutinized the background of the note's origins was unreasonable. But, even crediting Plaintiffs' argument that Springfield somehow failed to comply, the Third Circuit Court of Appeals has rejected the notion that such failure by the school constitutes a due process violation. "It is well-accepted that state law does not ordinarily define the parameters of due process for Fourteenth Amendment purposes; rather, the minimum, constitutionally mandated requirements of due process in a given context and case are supplied and defined by federal law, not by state law or regulations." *Shuman*, 422 F.3d at 150 n.4. The record lacks evidence that would establish that students have a right to enforce the Memorandum of Understanding between Springfield and the police department. Moreover, the Court is disinclined to endorse Plaintiffs' position that would indiscriminately hamstring a school from reporting an incident to the police.

The school's decision to question H.M. without a parent present likewise does not rise to the level of a federal constitutional or statutory violation. Plaintiffs do not cite to any law—federal or otherwise—that requires that a principal ensure a parent is present before asking a student about a potential disciplinary matter. *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 423 (3d

Cir. 2003) (holding kindergarten student's due process rights were not violated because neither parent was present when principal met with student prior to imposing a suspension for saying "I'm going to shoot you" to classmate). And, as the Supreme Court noted, in most cases, "the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Goss*, 419 U.S. at 582. Indeed, this observation reflects the practical realities that school officials and teachers face both in fostering a safe, learning environment and addressing disciplinary matters given their limited administrative resources. That is what happened here.

The record reflects that when Dr. Tracy asked H.M. about her handwriting that appeared to be a close match to part of the list, H.M. admitted that she wrote the name on the list. She has never recanted the admission that she wrote the seventh name on the list. School personnel then asked her to explain why those seven names of her classmates were listed at all. H.M. wrote out an "Incident Report" in which she explained that she "made the list for people I need to stay away from" and had kept the list since she was in the second grade. She admitted that no one coached her to write the contents of the "Incident Report." H.M. Depo. Tr. at 40:9-12. It was after H.M. admitted to writing at least part of the note and explained her reasons for it that Springfield notified her parents. It is undisputed that Springfield based the suspension decision on H.M.'s admission that she wrote part of the note.

Following the notice that she was facing a suspension, H.M. returned to school later (after being with her mother) that day to explain that another student was responsible for the list's creation and that these students were not those with whom H.M. had disputes. H.M. reiterated this version a few days later at the informal hearing. The dispute regarding H.M.'s intentions in authoring the note and the conflicting accounts she provided does not impact the due process analysis. Under both Supreme Court and Third Circuit precedent, Springfield afforded H.M. at least the constitutional minimum in connection with her suspension. And there is no serious

dispute that she had the opportunity to deny the allegations (and, so doing, to contradict the explanation she provided on November 28).

Finally, as a matter of law, the Court finds no support for Plaintiffs' argument that the alleged injury to the family's reputation is a due process violation. The "Fourteenth Amendment does not protect injury to reputation alone." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 797 (3d Cir. 2000). The situations in which an injury to reputation gives rise to a cognizable Fourteenth Amendment violation are limited. The case law both parties cite involves a public *employee's* termination and concomitant injury to reputation and good name. In such a case, the former employee is afforded a "name-clearing hearing" and must be given notice and an opportunity to be heard to refute whatever charges were made against him. *Graham v. Johnson*, 249 F. Supp. 2d 563, 565 (E.D. Pa. 2003) (collecting cases in the Third Circuit recognizing "name-clearing hearings"). Plaintiffs admitted at oral argument here that there is no case law supporting an analogous theory of harm for public school students whose reputations may have been implicated by actions taken by their school. And this Court is unaware of such authority. This argument is without merit.

## B. Substantive Due Process

To the extent Plaintiffs bring a substantive due process claim, they are challenging the constitutional validity of non-legislative state action—the school's exercise of its authority and discretion to discipline a student. *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000). To prevail on such a claim, Plaintiffs must establish "as a threshold matter that [they] have a protected property interest to which the Fourteenth Amendment's due process protection applies." *Id.* at 139-40. That is because not all property interests that are protected by procedural due process enjoy the same protection under substantive due process. *Reich v. Beharry*, 883 F.2d 239, 243 (3d Cir. 1989). A property interest must be recognized as "fundamental" under the United States

18

Constitution to be protected for purposes of substantive due process. *Hill v. Borough of Kutztown*, 455 F.3d 225, 235 n.12 (3d Cir. 2006).

As an initial matter, neither Plaintiffs' complaint nor their responses opposing summary judgment articulate what property interest upon which they base their substantive due process claim. In light of the context in which this claim is presented—that of challenging school discipline—the Court will construe the claim as one implicating H.M.'s right to obtain a public education. *See Taylor v. Metuchen Pub. Sch. Dist.*, No. 18-CV-1842, 2019 WL 1418124, at *5 (D.N.J. Mar. 28, 2019). But the substantive due process claim then must fail. That is because both Supreme Court and Third Circuit precedent have held that the "right" to public education is not a fundamental right. *Jarmon v. Batory*, No. CIV. A. 94-0284, 1994 WL 313063, at *10 (E.D. Pa. June 29, 1994) (citing *Plyler v. Doe*, 457 U.S. 202, 220–21 (1982)); *Astacio v. E. Brunswick High Sch.*, No. CV16938MASLHG, 2019 WL 3843090, at *13 (D.N.J. Aug. 15, 2019) (denying student's substantive due process claim because his property interest in receiving a free public education derives from New Jersey law). Certainly, then, there is no right to a discipline-free public education.

## C. Equal Protection

Finally, Springfield moves for summary judgment as to Plaintiffs' equal protection claim. The school contends there is no evidence that H.M. was treated differently than other similarly situated students. Plaintiffs respond that Springfield was biased against H.M. and her family because of their membership in an ethnic minority. They contend that this bias was manifested in statements Dr. Tracy made to Mrs. Sabbah and a questionnaire that was provided to the family from the Office of Special Education.

To bring a successful § 1983 claim based on the denial of equal protection, "plaintiffs must prove the existence of purposeful discrimination." *Shuman*, 422 F.3d at 151. And, they must establish that they received "different treatment from that received by other individuals similarly situated." *Id.* The facts in *Shuman* are a useful analogue here. There, the plaintiff, a male student, was accused of sexual misconduct. When the school allegedly ignored evidence that the encounter was consensual and did not discipline the female student involved in the incident, Shuman alleged discrimination on the basis of gender. Because Shuman was the only student who admitted to misconduct, he was the only student disciplined, prompting the appellate court to reject his equal protection claim.

The critical threshold question, then, is whether H.M. was in fact similarly situated to the other students who were also interviewed about the "To Kill" list. At least initially, the school posits that this cohort of students were similarly situated. These students, including H.M., were all questioned by the school officials and their journals were reviewed. This was done because they were in the classroom where the note was discovered. And each of these students, regardless of their race or ethnicity, academic record, or disciplinary history, were questioned without a parent or guardian present. All denied involvement.

Two things happened, however, that separated H.M. from the other students, all of whom appear to be Caucasian. First is that the school noticed that the handwriting in H.M.'s journal appeared similar to some of the writing on the note and that her journal contained "concerning" drawings and notes, including what appeared to be knives and the words, "I want to die." There is no evidence that other students' journals had similarly "concerning" drawings or statements. On that race-neutral basis, the school followed up with H.M. The second circumstance is that H.M.

admitted to her involvement in writing the list. From that point, it is true that the school treated her differently from the others. But, again, that was done for entirely race-neutral reasons.

Plaintiffs contend that the school's decision not to suspend another student, A.F., who H.M. later accused of writing the rest of the list, is evidence of disparate treatment. Springfield responds that the difference in treatment was not racially or ethnically motivated, but based on a lack of evidence to ascribe misconduct to A.F. Dr. Tracy Depo. Tr. at 62:9-14 ("I didn't have enough information that would to me reach that level that I could suspend [A.F.]."). A.F.,—and, indeed all students *except* H.M.—denied their involvement in writing the note or otherwise knowing about it. Although there were possible handwriting matches—not just from H.M.—the owners of those journals did not implicate themselves, a circumstance that distinguishes H.M. from the others.

Other than H.M.'s self-serving testimony, Plaintiffs do not offer any evidence to otherwise inculpate A.F. And the naked accusation does not meet Plaintiffs' burden at summary judgment. A.F. is thus not similarly situated to H.M. As the Third Circuit Court of Appeals emphasized in *Shuman*, the plaintiff's admission to "some form of misconduct" was a critical reason why he was not similarly situated to the other student. 422 F.3d at 151.

Plaintiffs contend that the discipline meted out is also evidence of disparate treatment. They boldly assert that "no student was ever treated this way" at Springfield. Doc. No. 18-1 at 22. But the record does not support Plaintiffs' hyperbolic claim. On at least one occasion, Springfield suspended another sixth grader student who was found to have engaged in threatening behavior. Dr. Zweiback Depo. Tr. at 93:23-94:5. Although Dr. Tracy admitted that he could not recall a carbon-copy situation where a middle school student wrote a "to kill list" targeting classmates, Dr. Zweiback recalled recent threats at Springfield High and at the middle school. *Id.* at 20:2-20. Plaintiffs' conclusory allegations are insufficient to create a genuine issue to withstand summary judgment.

As to the police department's decision to investigate, although possibly puzzling, there is no evidence to establish that Springfield sought it out as additional school-sanctioned discipline or otherwise endorsed the police's later involvement in bringing juvenile charges against H.M. Nor, for that matter, is there evidence that this was the first time Springfield ever reported a threat to the police. Dr. Zweiback testified that the school always notifies the police of a threat, as it is required to do. Dr. Zweiback Depo. Tr. at 21:7-14. In other words, there is no basis on which to surmise that the school singled out H.M. for law enforcement attention.

### ii. *Plaintiffs' Evidence of Race-Based Animus*

On these undisputed facts, Springfield has met its initial burden under Rule 56 of explaining its course of action and that the decision both to investigate and to discipline H.M. was not racially motivated. Fed. R. Civ. P. 56(e). The question remains whether the Plaintiffs have offered admissible evidence sufficient to allow a jury to find that Springfield intentionally discriminated against them on the basis of race. Because Springfield's conduct is explainable on race-neutral grounds, Plaintiffs need to present circumstantial evidence from which a jury could reasonably find that Springfield was motivated by a racially discriminatory purpose. This additional evidence must be more than the fact of H.M.'s race and that she was the only student disciplined.

As an initial procedural matter, the Court notes Plaintiffs' unique method of responding to Springfield's statement of undisputed facts. Plaintiffs appear to have responded to the recitation of facts in the motion as if it were a complaint and their response an "answer." Doc. No. 18. Contrary to this Court's published procedures, to the extent Plaintiffs dispute a fact, they have not included any citations to the record evidence that would otherwise support their contrary view.[3]

---

[3] The Court's Pre-Trial and Trial Procedures plainly state that when a fact is in dispute, "citation must be made to the record evidence that supports the party's view of that particular fact. Failure to address the moving party's factual contentions in this manner will lead to the Court's consideration of the moving

22

Instead, Plaintiffs engage in argumentation. This is a deficient—and frankly self-defeating—way to approach summary judgment. Fed. R. Civ. P. 56(e); *Celotex v. Catrett*, 477 U.S. 317, 324 (1986). Conclusory denials absent the scaffolding provided by record evidence make for a shaky house of cards on which to build a case. This has left the Court to try to locate the actual points of dispute hiding under assertions and argument.[4] *See NHS Hum. Servs. v. Lower Gwynedd Twp.*, No. CIV.A. 11-2074, 2012 WL 170740, at *7 (E.D. Pa. Jan. 20, 2012) (failing to cite to the record "does very little to assist the Court in making the type of fact-intensive examination required" at summary judgment).

Having carefully reviewed the deposition testimony and other "evidence" Plaintiffs adduce in support of their allegations, the Court finds that the evidence offered does not meet Plaintiffs' burden to show that the school's conduct during the investigation or its decision to suspend H.M. were motivated by racially discriminatory purposes. To the contrary, the majority of the "evidence" details the school's alleged violations of its Memorandum of Understanding with the local police department when it informed the police that a note was found. As the Court noted at oral argument, if this evidence were enough to make out a constitutional violation, a school that is intimidated by the threat of future civil litigation might not then report threats of school violence. The Court will not endorse this as a matter of dangerous public policy.

However, the Court will pause to discuss the limited evidence that is arguably related to race. Plaintiffs excerpt portions of Mrs. Sabbah's deposition testimony recounting her discussion with Dr. Tracy on November 28, which the Plaintiffs describe as "ethnically charged." Doc. No.

---

party's                  factual                  assertion(s)                  as                  undisputed."
*See* https://www.paed.uscourts.gov/documents/procedures/prapol2.pdf.

[4]     Rather than appropriately cite to the record in their statement of material facts, Plaintiffs instead have compiled a random laundry list of excerpted deposition testimony, which they then dropped into their brief. Doc. No. 18-1 at 17-20.

23

18-1 at 23. And they curiously describe one of the questionnaires supplied by the school's special education office as a "Patriot test."

*First*, Mrs. Sabbah contends that Dr. Tracy used "ethnically charged" language to describe H.M. Plaintiffs focus on Dr. Tracy's alleged statements that H.M. "represents danger to my school," and that "she have [sic] anger. Maybe she gets it from her background." Doc. No. 18-1 at 22; N.S. Depo. Tr. at 8:7-8; 14:19-21. Both statements are disputed. But crediting Mrs. Sabbah's self-serving testimony, neither statement is explicitly race-based. None of these words have "an exclusive or predominately racial meaning." *Barnes Found. v. Twp. of Lower Merion*, 982 F. Supp. 970, 988 (E.D. Pa. 1997).

Mrs. Sabbah did not testify to her understanding of these statements. Nor have Plaintiffs offered any evidence, including, for example, offering expert testimony to link those statements as racially derogatory. But even crediting Dr. Tracy's "danger" statement—which is disputed—it was in the context of H.M. admitting to writing at least part of a note titled "To Kill List," an inherently danger-laden matter. The mere fact that H.M. was the only non-Caucasian disciplined does not show that use of the word "danger" was intended to invoke or was motivated by H.M.'s ethnicity, rather than a reference to H.M.'s involvement in the note or the nature of the note itself on its face.

The Court will assume, for purposes of this motion, that a jury could reasonably infer that Dr. Tracy's alleged reference to H.M.'s "background" signaled that Dr. Tracy was not entirely motivated by legitimate concerns in investigating the "To Kill List." But even assuming this fact, this evidence does not negate H.M.'s admission that she wrote at least part of the note and that the school could take disciplinary action in response. Based only on the allusion to "background"— which is itself not explicitly tied to race or ethnicity—Plaintiffs would still need to establish that a jury could find that the school acted *because* of H.M.'s race or ethnicity. That burden is not met.

Mrs. Sabbah also testified that Dr. Tracy spoke to the principal of the elementary school which H.M. had attended and asked, "what kind of student do you send to our school?" As a threshold matter, this statement presents an obvious hearsay problem. Mrs. Sabbah relayed the alleged statement made by Dr. Tracy to this other principal. Mrs. Sabbah was not even present when the statement was made. N.S. Depo. Tr. at 12:22-13:8. Yet, Plaintiffs are offering it to prove the truth of the matter asserted—that Dr. Tracy said what Mrs. Sabbah said he said to a third-party. Fed. R. Evid. 801(c). Plaintiffs do not explain how this statement would be admissible under any of the exceptions to the hearsay rule. There is no testimony from the elementary school principal, or anything offered to suggest that Plaintiffs could introduce this testimony at trial. So, it cannot properly be considered in the mix of evidence at summary judgment that would create a dispute of material fact.

But, even assuming that this statement were admissible and could be considered, the alleged interaction between the two principals still does not satisfy Plaintiffs' burden of establishing some racially discriminatory purpose. Nor do the disputed statements allegedly made to Mrs. Sabbah rise to the level of material fact where Plaintiffs do not adduce evidence—other than the alleged words themselves—that they convey some sort of racial animus. *See Joyce v. City of Sea Isle City*, No. CIV. 04-5345RBK, 2008 WL 906266, at \*16 (D.N.J. Mar. 31, 2008), *on reconsideration in part sub nom. Joyce v. Sea Isle City*, No. CIV. 04-5345(RBK), 2008 WL 2875456 (D.N.J. July 23, 2008) (plaintiff's "subjective perception alone" of statement that was facially race neutral was not enough to establish an equal protection violation).

*Second*, Plaintiffs offer the AMAS-ZAAB questionnaire, which they describe as a "Patriot test," as evidence of the school's bias against H.M. At the time, the Office of Special Education included the questionnaire as one of the child behavioral checklists for students "who have multilingual households." Dr. Zweiback Depo. Tr. at 56:16-22; 62:15-23. As Dr. Zwieback

explained, the AMAS-ZABB is but one of several instruments that assist a psychologist in constructing a profile of a student. *Id.* at 59:2-60:4.

Contrary to Plaintiffs' arguments, the focus is not on *Plaintiffs'* reaction to receiving the questionnaire and their interpretation of it. For purposes of withstanding summary judgment, the critical inquiry is whether use of the questionnaire is evidence of a racial animus. The questionnaire was not provided as a result of any disciplinary action taken against H.M. Rather, the record shows that H.M. was referred to the Office of Special Education because the school had concerns about her mental and emotional state after she included drawings of what appeared to be knives and the words, "I want to die," in her school journal. Dr. Zweiback Depo. Tr. at 72:3-6. The school's concern for H.M.'s well-being and its statutory obligations under "Child Find," 22 Pa. Code § 14.121, which manifested in part with a battery of tests, are explainable on race-neutral grounds. Plaintiffs essentially ask the Court to step into the role of school psychiatrist or psychologist or social scientist to opine on the efficacy of particular assessment tools used to provide understanding about a possibly emotionally fragile student.

Moreover, Plaintiffs struggle to establish that H.M. was treated differently from any similarly situated person or group. The record establishes that, for the time Springfield included the AMAS-ZABB as part of its standard evaluation packet, it supplied the questionnaire about a dozen times to students referred to the Office of Special Education who the school identified as having a "bicultural family" or who come from a "multilingual home." Dr. Zweiback Depo. Tr. at 58:12-14. H.M. comes from a multi-lingual home, which is why she was eligible to receive this questionnaire.[5] So, there is nothing in the record that reflects that H.M. was treated differently from those multi-lingual students who received Springfield's standard evaluation packet.

---

[5] The school ceased using the questionnaire after the American Arabic Antidefamation organization sent the school a letter expressing some concerns. Dr. Zweiback Depo. Tr. at 65:16-66:7. The Sabbahs did not complete the questionnaire.

Because Plaintiffs' evidence does not create the requisite dispute of *material* fact that would allow a jury to find the school acted with racial animus or that H.M. was treated differently from those arguably similarly situated to her, the Court grants summary judgment as to Plaintiffs' equal protection claim as well.

## CONCLUSION

For the reasons set out in this memorandum, the Court grants Springfield's motion for summary judgment. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE